Filed 8/9/21  P. v. Maciel CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073347 |
| v. | (Super.Ct.No. INF1700472) |
| ERICK ALEXANDER MACIEL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Johnnetta E. Anderson, Judge.  Affirmed as modified with directions.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury convicted defendant and appellant Erick Alexander Maciel of committing several violent offenses against his former girlfriend, Jane Doe, and Jane's friend, Mary Doe. The evidence showed that Maciel attacked Jane and Mary with screwdrivers while Jane and Mary were moving Jane's belongings out of Maciel's home. As a result of the attacks, Jane and Mary each suffered significant physical injuries, including permanent injuries. At the time of the crimes, Maciel had no criminal history, was 31 years old, and worked as a registered nurse.

The jury found Maciel guilty in two counts of attempted voluntary manslaughter (Pen. Code, §§ 664, subd. (a),[1] 192, subd. (a), count 1 [Jane], count 2 [Mary]), as lesser offenses to charges of premeditated attempted murder (§§ 664, subd. (a), 187, subd. (a)). The jury found Maciel guilty as charged of torture against Jane (§ 206, count 3); aggravated mayhem against Jane (§ 205, count 4); mayhem against Mary (§ 203, count 5); felony domestic violence against Jane (§ 273.5, subd. (a); count 6); and, finally, assaulting Mary with a deadly weapon (§ 245, subd. (a), count 7). The jury further found that Maciel personally used a deadly weapon, a screwdriver, in counts 1, 2, and 6 (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury in counts 1, 2, 6, and 7 (§ 12202.7, subds. (a) [counts 1, 2, & 7], (e) [count 6]). Maciel was sentenced to consecutive terms totaling 18 years four months in prison on counts 1, 2, 5, 6, and 7, plus two life terms, to run concurrently to each other, on counts 3 and 4.

---

[1] Undesignated statutory references are to the Penal Code.

Maciel raises four clams of error. He first claims the court applied incorrect legal standards and abused its discretion in denying his pretrial motion for mental health diversion—that is, to suspend the criminal proceedings pending his completion of a mental health treatment program. (§ 1001.36.) He seeks the conditional reversal of the judgment and remand for a second mental health diversion hearing. We decline to grant this relief because we conclude that the court applied the correct legal standards and did not abuse its discretion in denying Maciel's pretrial motion for mental health diversion.

Maciel next raises two claims of sentencing error. For reasons we explain, we reject Maciel's claim that his sentences on one or more of the counts involving each victim (Jane [counts, 1, 3, 4, & 6]; Mary [counts 2, 5, & 7]) were required to be stayed. (§ 654.) Maciel further claims, and the People and we agree, that the court erroneously imposed a "full" consecutive three-year term on Maciel's attempted voluntary manslaughter in count 2. This full consecutive term was unauthorized under section 1170.16, which applies to the completed crime of voluntary manslaughter but not to attempted voluntary manslaughter. Thus, we strike the three-year base term on count 2, and we remand the matter for resentencing so the court can exercise its sentencing discretion anew, to the extent it is authorized to do so,[2] in light of this change to the judgment. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

---

[2] The court imposed one-half of the middle term, rather than one-half of the upper term, on count 1, the principal count. (§§ 193, subd. (a), 664, subd. (a).)

Fourth, and finally, Maciel claims, and the People and we agree, that the abstract of judgment (indeterminate) and the sentencing minute order must be corrected to reflect that the court imposed, but immediately struck, a $10,000 restitution fine; $210 in criminal conviction fees; and $280 in court operations assessments, based on its finding that Maciel lacked the ability to pay them. (*People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

In sum, we strike the three-year base term on count 2 as unauthorized. We remand the matter for resentencing and with directions to prepare a supplemental sentencing minute order and a corrected abstract of judgment, both showing that the court previously struck the restitution fine, criminal conviction fees, and court operations assessments. In all other respects, we affirm the judgment.

## II. FACTUAL BACKGROUND/TRIAL EVIDENCE[3]

A. *Prosecution Evidence*

### 1. Events Preceding the March 4, 2017 Offenses

In March 2017, Maciel and Jane were in a dating relationship and had been living in Maciel's house for around three weeks. Jane decided to break up with Maciel and move out of his house because they had been arguing about Jane's three-year-old son who lived with them three days each week. Jane was "terrified" that Maciel was going to hurt her son because Maciel had recently threatened to throw the boy out of the boy's bed

---

[3] Although not relevant to Maciel's claim that the court erroneously denied his pretrial motion for mental health diversion (§ 1001.36), the evidence presented at trial is relevant to Maciel's claims of section 654 sentencing error, as we demonstrate *post*.

and onto the floor. Maciel also told Jane that he wanted her to spend less time with her son, to give up some of her custody time, and to stop seeing her friend, B.S. He told Jane that he did not "come second to anybody." Jane felt very unsafe and told B.S. that she "had to get out" of Maciel's house.

Jane did not initially tell Maciel that she was breaking up with him and moving out. During the evening of March 3, 2017, while Maciel was working the 7:00 p.m. to 7:00 a.m. shift as a nurse at a hospital, Jane began packing her things at Maciel's house. B.S. had advised Jane to pack when Maciel was not at home because B.S. could "sense" that Jane was concerned for her safety. B.S. was planning to help Jane move her things to B.S.'s home.[4]

While at work during the evening of March 3, 2017, Maciel sent numerous texts and other communications to Jane, asking what she was doing, complaining that she was not responding to his messages and complaining that she had not asked him how his night was going, and directing her to unfriend one of his friends on social media, among other things. At one point, Jane texted Maciel that she had been busy cleaning the house. Around 9:00 p.m., before she left the house with B.S., Jane left a note for Maciel at his house, together with a ring he had given her. The note stated that Maciel's "threats and behavior" had "creat[ed] an unsafe and unstable environment," and that Jane could no longer have her son in the house with Maciel for "fear of what's going to happen next."

---

[4] Several months earlier, Maciel texted B.S., asking her not to invite Jane out anymore because they were in a relationship. This made B.S. believe that Maciel was "controlling and jealous."

5

Around 9:40 p.m., Maciel texted Jane, complaining that she was not answering his calls.  Around 10:44 p.m., it was apparent that Maciel had left work and had been back at his house because he texted Jane, asking her why she was leaving and whether she had taken his wallet, which he claimed was missing.  Around the same time, 10:44 p.m., Jane and B.S. were on their way back to Maciel's house to pick up a second load of Jane's things, when Maciel's car came speeding past Jane and B.S., nearly forcing B.S.'s car off the road.  Because of the road incident, B.S. did not want to return to Maciel's house, so B.S. and Jane returned to B.S.'s home.  Later that night, Maciel sent another message to Jane, demanding to know whether she was at B.S.'s house because he had seen B.S.'s car on the way to his house.

On the morning of March 4, 2017, Jane arranged with Maciel to pick up the rest of her things.  This time, Jane's friend Mary agreed to help Jane pick up the rest of her things from Maciel's house.  Mary and Jane arrived at Maciel's house around 12:16 p.m. On the way there, Jane told Mary that Maciel had been "not very nice" and "very mentally abusive" to her.

When Maciel came to the gate outside his house to let Jane and Mary inside, his demeanor was "standoffish and upset."  He asked Jane who she was living with, and Jane said, " 'Can I please get my stuff?' "  Maciel stood by the front door and watched as Mary and Jane carried two loads of Jane's things to Mary's car.  The front door stayed open.

6

2.  Jane and Mary's Account of the Offenses

After Jane and Mary came back inside the house to retrieve the last of Jane's things, Maciel asked Jane, " 'So, we are done?' " and Jane said, " 'Yeah.' "  Mary was several feet inside the front door, facing away from the door.  Jane was inside the house facing the door, and Maciel was standing inside the house and in front of the door, which was now closed.  Jane saw that Maciel then "pulled a screwdriver out of his pocket, . . . grabbed [Mary] from behind, and started stabbing her."  Maciel had two screwdrivers, one in each hand.

Mary felt a sharp pain in the back of her head and neck, and fell to the floor.  Jane screamed, " 'My God, what are you doing to her?' "  While on her hands and knees on the floor, Mary recalled "being hit really hard over and over," mostly on her head, shoulders, and neck.  The attack then suddenly stopped.  Mary tried to dial 911 on her cell phone, but she was unable to unlock her phone.

While Maciel was attacking Mary, Jane ran to the front door but was unable to unlock it; so, she ran to the sliding glass door at the back of the house, but that door was also locked.  When Jane first tried to leave through the front door, Maciel stopped attacking Mary and went after Jane.  When Jane was by the back, sliding glass door, Maciel attacked Jane with a screwdriver; he grabbed the back of her head with one hand, and shoved a screwdriver into her mouth with his other hand, dislodging two of her teeth.  Jane fell to the floor.  Maciel then went back after Mary, who by this time was trying to open the front door.

Mary was able to get her shoulder and elbow outside the front door, but Maciel pulled her back by her ponytail and slammed the door shut. He then pushed Mary to the floor and attacked her a second time. While straddling her body on his knees, he beat Mary, on both sides of her head, shoulders, face, and neck. Mary could not see whether Maciel had anything in his hands, but she could see that his hands were moving "fast and hard." Mary covered her head and face with her hands to protect herself. Mary did not recall passing out, but she awoke to the sound of Jane screaming in the backyard. Jane was saying, " 'Oh, my God. What are you doing to me?' " Mary unlocked the front door, ran outside, and shouted to the mail carrier to call 911.

While Maciel was attacking Mary the second time, Jane had gotten up from the floor, unlocked the back door, and ran into the backyard. Jane was unable to get out of the backyard because the backyard gate was locked from the outside. Jane saw a neighbor and was yelling for help. Jane then saw Maciel come out of the house with two screwdrivers in his hands. Jane fell to the ground and raised her hands and feet to protect herself.

Maciel bent over Jane and began stabbing her in the face with a screwdriver while she begged him to stop, apologized, and told him she would not leave. Maciel did not respond to Jane's pleas; he stabbed her in her left eye, ear, and throat, and he tried to stab her in her chest. He lodged a screwdriver rod in Jane's left eye socket. Jane recalled that the attack in the backyard lasted two to three minutes and stopped when someone chased Maciel away.

3. M.B.'s Intervention

The mail carrier, M.B., was completing his route near Maciel's house at the time of the attacks. Mary approached M.B., with blood all over her face, and said, "He is going to kill her." M.B. heard "banging and crashing" in Maciel's backyard and looked over a fence and into the backyard. Maciel was pushing and hitting Jane; Jane was pushing back defensively; and a metal rod was sticking out of Jane's face. A neighbor called the police.

M.B. began yelling at Maciel to stop. After a brief time, Maciel stopped attacking Jane and left the backyard through a carport area, walking in the opposite direction from where M.B. was standing on the other side of the fence, yelling at him. Jane appeared confused and began to wander toward the carport. M.B. yelled at Jane not to go that way because Maciel had gone that way, but Jane was saying that she had to get out of there.

Before Jane could leave the backyard, Maciel returned from the carport area with two screwdrivers in his hands and began attacking Jane again—for the third time. At that point, M.B. jumped over the fence to stop Maciel. Jane was on her back, and Maciel was on top of her, facing her. M.B. jumped on Maciel's back. Maciel stood up, made eye contact with M.B., then walked away, again leaving the backyard through the carport. Shortly thereafter, the police arrived.

4. The Aftermath of the Attacks

Maciel was inside his house when the police arrived. He sent a series of texts and social media messages to his friends and family, saying he had tried to kill Jane and he

9

was going to kill himself. He also texted, "I had to give that bitch what she deserves." Around 3:00 p.m., on March 4, Maciel surrendered to the police.

While in custody on March 5, Maciel initiated a conversation with a Riverside County sheriff's deputy. He told the deputy that he became "extremely mad" at Jane after she came over to get her things, explaining that an "argument broke out," and she shoved or "pushed" him. He admitted he stabbed Jane in the face with a screwdriver; and he also told the deputy that if he could not have Jane then no one else would have her either.

5. <u>Character Evidence</u>

The defense elicited character evidence about Maciel in its cross-examination of prosecution witnesses. Several of Maciel's friends testified that they were shocked when they received Maciel's texts following the assaults on Jane and Mary. They knew Maciel to be a "very kind, gentle person," and the attacks were "completely" out of character for him. M.B. also testified on cross-examination that Maciel had always been polite to him and that Maciel's behavior on March 4 was unlike anything he had ever seen Maciel do.

Jane testified that Maciel had initially been "gentle and sensitive and emotional" in their relationship. He was supportive of her role as a mother, and he had a budding friendship with her son. But he later began to exhibit signs of aggression and irritability, and he would lose his temper over small things. He had never been physically violent with Jane before March 4, but Jane acknowledged that she had once been physically violent with him. She once punched Maciel in his arm after he would not stop arguing with her and would not stop "pushing" her about her wanting to participate on a social

10

media site. Maciel was "very paranoid," and he would ask Jane multiple questions about her contacts with other people.

6. Jane's and Mary's Injuries

Jane and Mary suffered substantial and extensive physical injuries. A screw or part of a screwdriver was embedded in Mary's jaw and had to be surgically removed through a puncture wound in her ear. Mary also had a depressed scull facture; multiple fractures on her face; deep cuts on her face and hand; two puncture wounds on her arm; and stab wounds, scratches, and bruises on her face, neck, wrist, and under her breasts. Mary had permanent scarring on her face and other areas of her body.

Jane required four surgeries, including a craniotomy to remove the screwdriver rod from her left eye socket, which was piercing her brain. Jane's left ear drum was shattered, and she permanently lost hearing in her left ear. Her left eye permanently "drooped" due to muscle loss around the eye, and she could see a "floater" or black spot in her left eye.

Jane's face and throat were also punctured; she had multiple facial fractures; permanent scarring on her head, face, and throat; and the left side of her lip was permanently numb. She lost one tooth and another tooth was pushed forward, causing her speech to be impaired for several months. She was unable to walk or stand without assistance for around three months after the attacks. At the time of trial, two years after the attacks, she was unable to walk in a straight line and suffered from depression, panic attacks, and posttraumatic stress disorder.

11

B. *Defense Evidence*

### 1. Maciel's Account of the Assaults

Maciel testified that Jane gave him "a little push" when she first walked into his house on March 4, 2017. After Jane and Mary took two loads of Jane's things out of the house, Jane said to Maciel, " 'Have a nice life, dude,' " to which he responded, " 'Whatever.' " Jane then pushed him again, this time knocking him down.[5] Jane then grabbed a screwdriver—there were "tools all over the living room"—and "nick[ed]" Maciel in the back of his head with it. Maciel got up and Jane "lunged" at him; he then took the screwdriver from Jane and "busted out her teeth." Mary then tried to take the screwdriver from him, and he hit Mary in Mary's face with the screwdriver.

Jane then ran into the backyard through the back door, and Mary ran outside through the front door. The front door was never closed. Jane started "coming at" him again; he hit Jane in the face with the screwdriver a couple more times; and Jane "struggled" to get the screwdriver from him. During the struggle, he inserted the screwdriver into Jane's eye socket. He admitted that he stabbed Jane in the face with the screwdriver at least four or five times.

M.B. then jumped on his back, he "snapped out of [it]," and everything seemed like "a bad dream." He looked at M.B., then he walked back into his house. He denied walking away from Jane after he inserted the screwdriver into her eye socket, then coming back and attacking her again with two screwdrivers, as M.B. had testified. After

---

[5] Maciel is six feet three inches tall and weighed over 250 pounds on March 4, 2017.

12

he snapped out of it, he realized what had happened and that he had badly hurt Jane. He thought everyone would think that he tried to kill Jane, that no one was going to like him, and that he was "never going to be able to get a girl ever again." He went into his bathroom with a shotgun and a "bunch of knives," planning to kill himself.

2. Maciel's Steroid Use

Maciel further testified that he was born in 1985 and was "the chubby, fat kid growing up." He was "a late bloomer" and did not have a girlfriend until he was age 21. That relationship ended, and he did not have another girlfriend until he was age 29 or 30. Meanwhile, he was very focused on school, and it was difficult for him to meet women.

He began working out in high school, and he later pursued bodybuilding. Around 2011, he began using anabolic steroids to build his muscles. He believed that the discipline he had developed through working out would allow him to handle the side effects of the steroids he was using, which included irritability and mood swings. But after using steroids for 18 to 24 months, he began using additional steroids and having "very wild mood swings." He continually used steroids until two days before March 4, 2017, which was the last time he injected the drug. He had increased his steroids dosages, beginning on January 1, 2017. He considered himself a "veteran" steroid user. At the time of trial, he was "a lot more calm" because he had not been using steroids for two years.

After he first began using more steroids, around 2013, he felt "invincible" and became more aggressive. People would ask him why he had been "snappy" when he had not realized that he had been. While dating the girlfriend he had when he was age 29 or

13

30, he felt "competitive" and "jealous," and he wanted to be "dominating." When that relationship ended, he felt "very betrayed." Shortly thereafter, he met Jane through a dating website. He told Jane that he was using steroids.

Because of his steroid use, he became "paranoid" in the "extreme" and suspected Jane was cheating on him. He would search her phone for evidence of infidelity, and he often became upset when Jane and her son were living with him. Jane once told Maciel that she was afraid of him. She also told him that she hit him in the arm "after 30 minutes of pretty severe mental abuse and asking [him] to stop several times." After he went to work on the evening of March 3, 2017, he became suspicious that Jane was moving out. While driving "really fast" to get to his house later that evening, he saw B.S.'s car, but he denied trying to run B.S. off the road or scare B.S. and Jane. When called as a defense witness, Jane testified that Maciel told her he was using steroids around two weeks after they began dating in mid-2016. She suspected that Maciel's steroid use was causing his paranoia and aggressive behavior.

### 3. Character Evidence

Maciel's father testified that Maciel was "noble" and "caring"; liked to help others; and had been taught "good manners" and "how to be nice to people." He had never been in trouble with anyone.

### 4. Expert Testimony on Effects of Steroid Use

A forensic psychiatrist, Dr. Suzanne Dupee, testified for the defense as an expert on the effects of anabolic steroid use. Chronic anabolic steroid use, over a long period of time, can cause mania, irritability, paranoia, and aggressiveness, resulting in violence. A

14

related effect is sudden and severe rage, known as "roid rage," which can be triggered by minimal or no provocation. Maciel was taking sufficient steroids to cause these effects, and sleep deprivation can exacerbate these effects.

C. *Prosecution Rebuttal Evidence*

Photos of Maciel's front and back, taken when he was in custody on March 4, 2017, showed that he had a small scratch on the left side of his neck but did not show that he had any other injuries to his head or neck. A competitive bodybuilder, M.K., who had used steroids for years, testified that, in his experience, using steroids can cause unstable moods and irritability; but, without other drugs, steroids do not cause paranoia, aggressiveness, or violent behavior.

D. *Defense Surrebuttal Evidence*

When Maciel was booked into jail on March 4, 2017, he tested negative for methamphetamine, cocaine, heroin, and marijuana. He was not tested for steroids.

## III. DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion in Denying Maciel's Pretrial Motion for Mental Health Diversion* (§ *1001.36*)

Maciel claims the trial court abused its discretion in denying his pretrial motion for mental health diversion. (§ 1001.36.) He claims insufficient evidence supports the court's finding that his diagnosed mental health disorder, schizoaffective disorder, was not a significant factor in his commission of the charged offenses. (§ 1001.36, subd. (b)(1)(B).) He further claims that the court applied incorrect legal standards in

making two additional findings: (1) that the psychologist who diagnosed his disorder did not provide a sufficient basis for her opinion that the disorder would respond to treatment (*id.*, subd. (b)(1)(C)), and (2) that he posed an unreasonable risk of danger to public safety—that is, he was reasonably likely to commit a super strike offense—if he were treated for his disorder in the community (see *id.*, subd. (b)(1)(F)).

We conclude that substantial evidence supports the first finding, and that the court applied the correct legal standards in making the second and third findings. Thus, we conclude that the court did not abuse its discretion in denying the motion.

1. Section 1001.36, Eligibility Requirements

Section 1001.36 authorizes courts to grant pretrial diversion to defendants who meet the statute's six qualifying criteria or eligibility requirements. (§ 1001.36, subds. (a), (b)(1); *People v. Williams* (2021) 63 Cal.App.5th 990, 995.)[6] For purposes of section 1001.36 " 'pretrial diversion' " means "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment," for a period not to exceed two years. (§ 1001.36, subd. (c).) If mental health diversion is granted and the defendant satisfactorily completes the court's approved

---

[6] Section 1001.36 was enacted effective June 27, 2018 (Stats. 2018, ch. 34, § 24; *People v. Williams*, *supra*, 63 Cal.App.5th at p. 995) after Maciel was alleged to have committed the charged offenses on March 4, 2017, but before he filed his pretrial motion for mental health diversion in December 2018. Section 1001.36 applies retroactively to all criminal cases in which the judgment of conviction and sentence is not final. (*People v. Frahs* (2020) 9 Cal.5th 618, 626, 630.) Maciel's judgment is not final, and Maciel timely moved for mental health diversion before his trial began. (*People v. Braden* (2021) 63 Cal.App.5th 330, 334.)

mental health treatment program, then the defendant's criminal charges are required to be dismissed and the defendant's arrest on the charges "shall be deemed never to have occurred." (§ 1001.36, subd. (e).)

In order for a defendant to qualify for pretrial mental health diversion, the court must first be "satisfied that the defendant suffers from a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders . . . ." (§ 1001.36, subd. (b)(1)(A).) Second, the court must also be "satisfied that the defendant's mental disorder was a significant factor in the commission of the charged offense." (*Id*., subd. (b)(1)(B).)

Third, "[i]n the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd. (b)(1)(C).) The third criterion is not met unless the court is "satisfied that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant." (*Id*., subd. (c)(1)(A).) And, before approving a proposed mental health treatment program, the court "shall consider the request of the defense, the request of the prosecution, the needs of the defendant, and the interests of the community." (*Id*., subd. (c)(1)(B).)

Fourth, the defendant must consent to diversion and waive the right to a speedy trial. (§ 1001.36, subd. (b)(1)(D).) Fifth, the defendant must agree to comply with treatment as a condition of diversion. (*Id*., subd. (b)(1)(E).)

17

Sixth, the court must be "satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (*Id.*, subd. (b)(1)(F).) In determining whether the sixth criterion is met, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (b)(1)(F).)

More generally, in determining whether each of the six criteria are met, the court is required to consider "the positions of the defense and prosecution." (§ 1001.36, subd. (a).) The defendant has the burden of making a prima facie showing of his or her eligibility for mental health diversion and that the defendant and the offenses are suitable for diversion. (*People v. Frahs*, *supra*, 9 Cal.5th at p. 627.) "If the defendant makes a prima facie showing that he or she meets all of the threshold eligibility requirements and the defendant and the offense are suitable for diversion, and the trial court is satisfied that the recommended program of mental health treatment will meet the specialized mental health treatment needs of the defendant, then the court may grant pretrial diversion. (§ 1001.36, subds. (a), (b)(3), & (c)(1).)" (*Ibid.*)

2. Maciel's Motion for Pretrial Mental Health Diversion

(a) *Dr. Berkowitz's report and conclusions*

In support of his motion, Maciel submitted a report by clinical and forensic psychologist Alice R. Berkowitz, Ph.D. In her report, Dr. Berkowitz wrote that she had completed a "full psychosocial and psychological testing evaluation" of Maciel "to

18

determine his personality structure, history," and whether he qualified for pretrial mental health diversion under section 1001.36.

In preparing her report, Dr. Berkowitz reviewed the preliminary hearing transcript, a police report of the crimes, and two reports by district attorney investigators. On November 2, 2018, Dr. Berkowitz interviewed Maciel in custody for approximately two and one-half hours. Over approximately five additional hours on the same day, Maciel completed a series of psychological tests. Based on all of this information, Dr. Berkowitz concluded that Maciel suffered from a qualifying mental health disorder, namely, "schizoaffective disorder—bi-polar type." (§ 1001.36, subd. (b)(1)(A).) The doctor's report includes the following additional information and conclusions:

*Maciel's History*: Maciel was born in 1985 "to an intact family"; his parents were still married; and he had one older brother. He described his childhood as "average" but felt his parents were "much harder on him than his brother." "He liked school, and he did well in school," but he said he, "always felt invisible and 'like [he] did not fit in anywhere.' " In school he had "very few friends"; he was "chubby"; and he did not date until the end of high school. He did not have a girlfriend until age 20. He reported being "depressed most of his life" and having "never received help for his depression or suicidal ideation." He "spent a great deal of time alone playing video games."

At age 23, he "felt acutely suicidal." He devised a plan to commit suicide but "at the last minute, he kept thinking about all the people [who] were always 'out to get' him" and "decided that if he killed himself, they would all like it." He did not kill himself, so as not to "give those people the satisfaction." He pursued a nursing career, completing a

19

three-year nursing program, and received his "RN degree." He was employed as a registered nurse for seven months before the charged offenses occurred on March 4, 2017. He denied abusing alcohol or illicit drugs, "with the exception of his steroid abuse." He began using steroids around 2012 to "build himself up" and "aid" his self-esteem. He injected steroids on a daily and twice weekly basis. The steroids made him feel " 'stronger,' " but also made him feel "irritable, angry, paranoid, and added to his depression." On steroids, he had trouble sleeping and "controlling his impulses."

*Maciel*'s "*Mental Status Examination*": During the interview, Maciel "was focused," "answered questions in a polite manner," and appeared to be "of at least average intelligence." His affect was "somewhat flat and mood labile," although he said he felt "positive throughout" the interview. He spoke of his suicidal ideation that had been "present since his teen years," and of "having enormous amounts of energy at times and then 'crashing' when his depression sets in." His interview responses were "appropriate" and "there was no evidence of overt psychotic processes." But he demonstrated "paranoid and grandiose thinking" in his responses, and "other elements of a thought disorder in the way he described events in his life and the current incident." "The presence of delusions was evident in his responses, particularly about people being out 'to get' him. His social isolation seems a way that he copes [with] these fears and delusions. He clearly sees people as dangerous."

*Maciel*'s *Psychological Test Results*: Maciel responded inconsistently to some psychological test items, and he tended "to over-report and under-report symptoms"; but his test results in Dr. Berkowitz's opinion still "suggest[ed] a valid profile." His

20

responses were consistent with "severe psychopathology" and indicated "serious and pervasive thought dysfunction." His "[d]ysfunctional thinking include[d] ideas of persecution and aberrant perceptions and thoughts. He was "likely to be suspicious of others, to have interpersonal difficulties as a result, . . . and to lack insight." He was "likely to be hostile to others and feel alienated from people."

He also "appear[ed] to demonstrate rapid and extreme mood swings, persecutory and disorganized thinking, irritability, and impulsivity. He responds as having a very high activity level that can be associated with manic or hypomanic episodes. It is hard to know whether these were the result of his prolonged steroid use or part of his psychopathology. . . . [S]uch an activity level was not noted in his behavior and speech during the evaluation." He "appear[ed] to have a marginal hold on reality, which is heightened by his social isolation, socially awkward behaviors, and suicidal ruminations. There is no evidence of sociopathy or psychopathy in his testing. If anything, [he] suffers from profound guilt, depression, and feelings of alienation." His "STAX1-2" test results suggested that he "struggles with feelings of irritability and anger . . . . Along with this, [he] tends to get angry and hold a grudge. With a thought disorder and other psychotic symptomatology, it is possible for [him] to become angry to a boiling point, where he either acts out his anger or takes actions that are high risk to himself."

The report concluded: "[I]t is clear" that Maciel "suffer[s] from a psychotic disorder, whereby he experiences delusions, probable hallucinations, excessive mood swings from hypomania to severe depression. These symptoms have appeared to be present since his puberty or his early teens. His use of the mix of steroids that he

21

informed this expert of, could only have worsened the symptoms and pathology that were already present, but would not have been the cause of it. It is clear that [his] mental health issues were the significant factor in these offenses. His paranoia and delusions made him feel like he was in danger, and he reacted in a violent manner as a result."

After diagnosing Maciel as having "DSM V: Schizoaffective Disorder (295.70-Bipolar type)," the report further concluded that "it appear[ed]" Maciel qualified for mental health diversion under section 1001.36. Dr. Berkowitz summarily opined that Maciel "would respond and benefit significantly from both psychopharmacological treatment and psychotherapy focusing on cognitive behavioral therapy. In addition, and most importantly, . . . Maciel would not pose a risk to the public safety participating in the diversion program."

(b) *Character references*

As further support for his motion, Maciel submitted over 30 letters from friends and family members, attesting to his good character, intelligence, and reputation for courtesy, kindness, and compassion toward others.

3. The People's Opposition

The People filed a written opposition to the motion. Among other things, the People argued that the court should *not be satisfied* that Maciel suffered from schizoaffective disorder—bipolar type, calling the diagnosis "outrageous and far-reaching to meet the prima facie showing." The People pointed out that Dr. Berkowitz's report did not mention the more than 30 letters from Maciel's friends and family—the "character references"—attesting to Maciel's "intelligence," "service to others," and

22

reputation for being an "overachiever" and "overly compassionate." These character references, the People argued, "completely contradict[ed]" Dr. Berkowitz's diagnosis of Maciel having schizoaffective disorder—bipolar type. Nor did the doctor's report mention, or attempt to reconcile with its diagnosis, that Maciel was planning to marry. In October 2018, Maciel filed a motion to obtain his identification so he could obtain a marriage license.

The People argued that Maciel's feelings of isolation, fears, delusions, and views of others as dangerous were likely due to two things: Maciel's involvement in a physical altercation with other jail inmates on March 5, 2017, and Maciel's witnessing another physical altercation between two other inmates on March 23, 2018. The People also argued that Maciel's feelings of guilt, depression, and alienation were "completely normal and understandable," given the severity of the charges and sentences he was facing, "after trying to torture and murder two innocent women . . . ."

Based on this additional evidence, the People further argued that the court "should not be satisfied" that (1) Maciel's mental health disorder was a significant factor in his commission of the charged offenses (§1001.36, subd. (b)(1)(B)); (2) Maciel's mental health disorder symptoms would respond to treatment, despite Dr. Berkowitz's conclusory opinion that they would (§ 1001.36, subd. (b)(1)(C)); or (3) Maciel would not pose an unreasonable risk of danger to public safety if treated in the community. (§ 1001.36, subd.(b)(1)(F)). Again, the People pointed out that Maciel's character and reputation for being "overly compassionate" and his current desire to marry a "new found love" were completely inconsistent with his diagnosis of schizoaffective disorder—

23

bipolar type. And, because Maciel had no qualifying mental health disorder, there was no mental health treatment program or plan that would treat the symptoms of his nonexistent disorder. Maciel's decision to harm his victims, the People argued, was "calculated and planned."

4. The Trial Court's Ruling

The court denied the motion following a brief hearing on January 4, 2019. The court first found that Maciel had a qualifying mental health disorder, namely, schizoaffective disorder, noting there was "a sufficient level of credibility" to support the diagnosis. But the court found "completely lacking" any causal connection between Maciel's schizoaffective disorder and his alleged criminal conduct on March 4, 2017. The court pointed out that Dr. Berkowitz said that there was a connection "without really explaining why or giving any supporting information." The court also found lacking in evidentiary support the doctor's conclusion that Maciel's mental health symptoms would respond to treatment. The court noted that the doctor recommended "counseling" and "pharmacological intervention" but did not explain "what course would be necessary," what the "likely effect" or "outcome" of the treatments would be, or how long the treatments would take.[7]

Lastly, the court found that Maciel would pose an unreasonable risk of danger to public safety if treated in the community. On this point, the court reasoned: "The doctor is very clear that Mr. Maciel suffers from a serious and pervasive thought disfunction,

_____

[7] Two years is the maximum period during which criminal proceedings may be diverted under section 1001.36. (§ 1001.36, subd. (c)(3).)

auditory and visual hallucinations.  He has significantly impaired reality testing.  He lacks insight.  He is emotionally [labile], impulsive, irritable; he has a marginal hold on reality.  [¶]  That coupled with her final conclusion that he demonstrated impulsivity, poor judgment, and excessive anger at times, which appears to be perhaps what manifested in this case.  I am a little bit unclear.  Nonetheless, someone with that tenuous a hold on reality, I don't think is someone [who] can be treated safely in the community under any standard; therefore, I will find that . . . there is insufficient information before me to make a prima facie finding [of Maciel's eligibility for pretrial mental health diversion]."

5. Standard of Review

We review a court's order denying a motion for pretrial mental health diversion for an abuse of the court's discretion.  (*People v. Moine* (2021) 62 Cal.App.5th 440, 448-449; § 1001.36, subd. (h) [The court exercises its discretion in determining whether to grant mental health diversion.].)  "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)  But "[a] court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence." (*People v. Moine*, at p. 449.)  "Substantial evidence 'means evidence that is "reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case." ' " (*In re Alexander C.* (2017) 18 Cal.App.5th 438, 446.)

6. <u>Analysis</u>

    (a) *The second eligibility criterion (§ 1001.36, subd. (b)(1)(B))*

We begin with Maciel's claim that insufficient evidence supports the court's finding on the second eligibility criterion, namely, that his diagnosed mental health disorder, schizoaffective disorder—bipolar type, was not a significant factor in his commission of the charged offenses.

Section 1001.36, subdivision (b)(1)(B), requires the court to be "satisfied that the defendant's mental disorder was a significant factor in the commission of the charged offense. A court may conclude that a defendant's mental disorder was a significant factor in the commission of the charged offense if, after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense, the court concludes that the defendant's mental disorder substantially contributed to the defendant's involvement in the commission of the offense."

As noted, in finding that Maciel's schizoaffective disorder was not "a significant factor" in his commission of the charged offenses (§ 1001.36, subd. (b)(1)(B)), the court found that Dr. Berkowitz's report was "completely lacking" in making any connection between Maciel's schizoaffective disorder and his commission of the charged offenses. The court said, "[t]he doctor simply says there is a connection without really explaining why or giving any supporting information." Substantial evidence supports this finding.

26

As the People point out, in her report, Dr. Berkowitz did not explain why Maciel's schizoaffective disorder was a "significant factor" in his commission of the charged offenses. To be sure, the doctor stated that Maciel's "mental health issues" were "the significant factor" in his commission of the charged offenses, and that his "paranoia and delusions made him feel like he was in danger, and he reacted in a violent manner as a result." But, as the court said, the doctor did not explain why Maciel's schizoaffective disorder was a significant factor in his commission of the charges offenses, nor did she provide any supporting information to support this conclusion. The doctor did not explain the symptoms and behaviors of individuals with schizoaffective disorder and how such symptoms and behaviors were a significant factor in Maciel's commission of the charges offenses. Thus, the court reasonably concluded that Maciel did not make a prima facie showing that his schizoaffective disorder was a substantial factor in his commission of the charged offenses. (§ 1001.36, subd. (b)(1)(B).)

Additionally, based on the preliminary hearing transcript, the court could have reasonably concluded that Maciel was motivated by his anger toward Jane in committing the charged offenses, and that his paranoia and irrational (if actual) belief that others were "out 'to get' him" was not a substantial factor in his commission of the charged offenses. The People's opposition stated that Maciel's phone records showed that he had been confiding in his close friends about his intention to kill Jane so that "nobody else could have her," before the charged offenses occurred. Further, the doctor's report stated it was "hard to know" whether Maciel's "manic or hypomanic episodes" "were the result of his prolonged steroid use or part of his psychopathology"; and that, during his evaluation, he

27

did not demonstrate a "high activity level," which can be associated with manic and hypomanic episodes. In addition, the report stated, "[t]here is no evidence of sociopathy or psychopathy in his testing. If anything, [he] suffers from profound guilt, depression, and feelings of alienation." In these respects, the report tended to undermine its conclusion that Maciel's schizoaffective disorder—bipolar type, was a significant factor in his commission of the charged offenses.

Maciel claims the court was "incorrect in finding the doctor simply made a conclusory connection between the disorder and the conduct." "In fact," he argues, "the report discussed the connection at some length." He points to the report's statements that he "appear[ed]" to demonstrate "rapid and extreme mood swings, persecutory and disorganized thinking, irritability, and impulsivity" during his evaluation, and that "it is possible for [him] to become angry to a boiling point, where he . . . acts out his anger . . . ." He also points to the report's statements that "elements of a thought disorder" were apparent "in the way he described events in his life and the current incident [i.e., the charged offenses]," and that he "clearly sees people as dangerous."

Again, however, the court could have reasonably credited the preliminary hearing transcript over the conclusory and, at times, qualified statements in the report, both in concluding that the report did not make a prima facie showing that Maciel's schizoaffective disorder, bipolar type, was a substantial factor in his commission of the charged offenses, and in further concluding that the disorder was not a significant factor in Maciel's commission of the charged offenses. As the People argue, this is so, given "the utter lack of specificity in the doctor's report," and "the strong evidence pointing to a

28

jealous rage," as the motivating factor in Maciel's commission of the charged offenses, as detailed in the preliminary hearing transcript. In sum, the court's finding that Maciel failed to make a prima facie showing that his schizoaffective disorder was a significant factor in his commission of the charged offenses is supported by substantial evidence, is not outside the bounds of reason, and was, therefore, not an abuse of the court's discretion.[8]

(b) *The third eligibility criterion* (§ *1001.36*, *subds.* (*b*)(*1*)(*C*), (*c*)(*1*)(*A*))

Maciel next claims the court applied an incorrect legal standard in "disregarding" Dr. Berkowitz's opinion that his schizoaffective disorder, bipolar type, would respond to treatment. He asserts that, "the code does not permit the court to override [a] psychologist's opinion on this point." We disagree.

As noted, the court found that Dr. Berkowitz did not provide a sufficient evidentiary basis for her opinion that Maciel's mental health symptoms, or his schizoaffective disorder, would respond to mental health treatment. (§ 1001.36, subd. (b)(1)(C).) The court said that the doctor's report "simply" stated, "It can be treated," and recommended "counseling" and "pharmacological intervention," but did not

---

[8] Maciel argues that *the jury* apparently agreed with the doctor's assessment that, "his paranoia and delusions made him feel like he was in danger and he reacted in a violent manner as a result." For reasons we explain *post*, in addressing Maciel's section 654 claims, we agree with Maciel that the jury necessarily credited his trial testimony that he actually, albeit unreasonably, believed in the need to defend himself against Jane and Mary in finding him guilty of the lesser offenses of attempted voluntary manslaughter, based on unreasonable self-defense, in counts 1 and 2. But the trial court did not have Maciel's trial testimony, or the jury's verdicts, before it when it ruled on the pretrial motion for mental health diversion.

29

"explain what course would be necessary, what the likely effect would be, what the likely outcome will be, [and] how long it would take.  There is absolutely nothing.  It is a very conclusory statement.  I don't think there is enough" to make the showing.  Substantial evidence supports this finding, and the court did not apply an incorrect legal standard in making it.

Section 1001.36, subdivision (b)(1), provides that the court may grant pretrial diversion "pursuant to this section" if six criteria are met, including the following:  "In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment."  (§ 1001.36, subd. (b)(1)(C).)  Maciel relies on this portion of the statute in arguing that the statute does not allow the court "to override" a psychologist's opinion that a defendant's symptoms "would respond" to mental health treatment.

Maciel's argument disregards additional language in section 1001.36, which requires the court, as a condition of granting pretrial diversion, to be "satisfied that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant."  (§ 1001.36, subd. (c)(1)(A); see *People v. Frahs*, *supra*, 9 Cal.5th at p. 627.)[9]  This condition was not met here.

---

[9]  Additionally, the trier of fact may reject the testimony of an expert witness, even if the witness's testimony is uncontroverted, provided the court does not act arbitrarily.  (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890; see *People v. Combs* (2004) 34 Cal.4th 821, 851.)  Thus, the suggestion that expert witness testimony must be accepted no matter how weak, lacking in foundation, or erroneous, is untenable.

The doctor's report stated that Maciel would "respond and benefit significantly from both psychopharmacological treatment and psychotherapy focusing on Cognitive Behavioral Therapy." But, as the court said, the report did not explain what precise course of treatment would be necessary, or how much treatment Maciel would require to meet his specialized mental health needs. In the words of the court, the report did not explain, "what course would be necessary, what the likely effect would be, or how long it would take." These showings were critical in order for the court to be able to determine, and to be satisfied, that the doctor's proposed treatment plan would meet Maciel's specialized mental health needs. (§ 1001.36, subd. (c)(1)(A).) The length of the proposed treatment plan is also a critical showing, which was lacking here, given that two years is the maximum period during which criminal proceedings may be diverted under the statute. (§ 1001.36, subd. (c)(3).)

Thus, the court reasonably determined that it was not satisfied that the doctor's proposed plan of psychotherapy and psychopharmacological treatment for Maciel would meet his specialized mental health needs. (§ 1001.36, subd. (c)(1)(A).) The court did not apply an incorrect legal standard or abuse its discretion in making this finding.

(c) *The sixth eligibility criterion (§ 1001.36, subd. (b)(1)(F))*

Maciel further argues that the court applied incorrect legal standards, and thus abused its discretion, in finding he would pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if he were treated for his mental health disorder in the community. (§ 1001.36, subd. (b)(1)(F).) He claims the court made two legal errors in making this finding: (1) the court did not address the likelihood that he would commit

31

a " 'super strike' " offense, as required by the statute, and (2) the court did not consider his "dangerousness in the context of his dangerousness while receiving treatment." We disagree on both counts.

For purposes of section 1001.36, section 1170.18 defines "unreasonable risk of danger to public safety" as "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c).) Section 667, subdivision (e)(2)(C)(iv) enumerates a particular set of so-called "super strike" offenses, including, as relevant here, (1) "Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive" (§ 667, subd. (e)(2)(C) (iv)(IV)); and (2) "Any serious or violent felony offense punishable in California by life imprisonment or death" (§ 667, subd. (e)(2)(C) (iv)(VIII)). Two of the charged offenses against Maciel, aggravated mayhem (count 4), and torture (count 3) are punishable by life imprisonment (§§ 205, 206.1), and thus constitute super strikes.

In finding that Maciel would pose an unreasonable risk of danger to public safety if treated in the community, the court relied on Dr. Berkowitz's findings that Maciel suffered from "a serious and pervasive thought dysfunction, auditory and visual hallucinations" and "significantly impaired reality testing. He lacks insight. He is emotionally [labile], impulsive, irritable; he has a marginal hold on reality. [¶] That, coupled with the doctor's final conclusion that he demonstrated impulsivity, poor judgment, and excessive anger at times, which appears to be perhaps what manifested in

this case. . . . [S]omeone with that tenuous a hold on reality, I don't think is someone [who] can be treated safely in the community under any standard . . . ."

Although, as Maciel points out, the court did not *expressly* address whether he was likely to commit a super strike if treated in the community, the record shows that the court was well aware of the requirements for granting mental health diversion under section 1001.36. As the court in *People v. Moine*, *supra*, 62 Cal.App.5th 449 recently explained, "[b]y requiring an assessment of whether the defendant 'will commit a new violent felony' within the meaning of section 667, subdivision (e)(2)(c)(iv), a trial court necessarily must find the defendant is 'likely to commit a super- strike offense.' " (*Id*. at p. 450.) The court here effectively made this finding. The record shows that the court read the preliminary hearing transcript and that Maciel was being charged with two super strike offenses: aggravated mayhem and torture. In finding that Maciel posed an unreasonable risk of danger to public safety if treated in the community, the court effectively found that he was likely to commit aggravated mayhem or torture if treated in the community, based on his current mental health symptoms.

Regarding Maciel's claim that the court further erred in failing to consider whether he was likely to commit a super strike offense *while under treatment in the community for his schizoaffective disorder*, Maciel correctly points out that whether a defendant poses an unreasonable risk of danger to public safety is "necessarily a forward-looking inquiry" that accounts for the circumstances of his or her release. (See *People v. Williams* (2018) 19 Cal.App.5th 1057, 1063.) And, indeed, Maciel would be required to complete a court-approved mental health treatment plan if released on diversion.

33

(§ 1001.36, subd. (c)(1)(B).) Maciel faults the court for not discussing Dr. Berkowitz's proposed mental health treatment plan in determining that he would pose an unreasonable risk of danger to public safety if released on diversion.

But, as the court pointed out, Dr. Berkowitz only recommended psychotherapy and psychopharmacological treatment as Maciel's treatment plan. Her report did not include a detailed treatment plan, nor did it explain how Maciel would respond to treatment or how long it would take him to respond, in any way, to treatment. The report also did not address how Maciel's treatment would cause him not to pose an unreasonable risk of danger to public safety. As the People argue, "Because Dr. Berkowitz's report was so vague with regard to a treatment plan, it was impossible for the court to evaluate whether [Maciel] would be dangerous while undergoing mental health treatment."

Thus, the court reasonably assumed that Maciel's mental health symptoms would continue if he were to be released in the community, even while undergoing psychotherapy and psychopharmacological treatment. Lastly, the doctor's report stated, in conclusory terms and with no supporting explanation, that Maciel would not pose an unreasonable risk of danger to public safety if released. But the current charges against Maciel, as detailed in the preliminary hearing transcript, together with the doctor's report of his current mental health symptoms, indicated that Maciel was likely to commit torture or aggravated mayhem if released on diversion, despite his lack of a criminal record and his good reputation in the community before the charged offenses occurred.

B. *Substantial Evidence Supports the Court's Decision to Impose Separate, Unstayed Sentences on Counts 1 through 7* (§ *654*)

For several reasons, Maciel claims the court erroneously failed to stay the terms it imposed on at least one of the three counts involving Mary (counts 2, 5, & 7) and on at least two of the four counts involving Jane (counts 1, 3, 4, & 6). He claims, among other things, that his crimes against Jane and Mary either arose from a single act or were part of an indivisible course of conduct, undertaken with the sole intent and objective of killing Jane and Mary. Thus, he argues, he could only be punished on one count, or at most two counts, involving each victim. For reasons we explain, we disagree.

1. Relevant Background

Maciel was convicted in four counts involving Jane and in three counts involving Mary, together with enhancements on counts 1, 2, 6 and 7. On the counts involving Jane (counts 1, 3, 4, & 6), with enhancements, Maciel was sentenced to eight years on count 1 (attempted voluntary manslaughter), life with the possibility of parole on count 3 (torture), life with the possibility of parole on count 4 (aggravated mayhem), and two years eight months on count 6 (felony domestic violence). On the counts involving Mary (counts 2, 5, & 7), with enhancements, Maciel was sentenced to four years four months on count 2 (attempted voluntary manslaughter), one year four months on count 5 (mayhem), and two years on count 7 (assault with a deadly weapon). The court imposed consecutive terms on counts 1, 2, 5, 6, and 7; ordered the life term on count 4 to run concurrent to the life term on count 3; and ordered the life terms on counts 3 and 4 to run consecutively to the other counts.

At sentencing, the court expressly declined to stay any of the terms on Maciel's seven convictions and attendant enhancements. (§ 654.) The court explained: "The court, having heard all the evidence and relying on [*People v. Trotter* (1992) 7 Cal.App.4th 363], it is imperative that the defendant's punishment will be [commensurate] with his culpability. [¶] The defendant's conduct in this case became more egregious with each successive attack and stab. Each stab and attack clearly pose[d] a separate and distinct risk to both Mary Doe and Jane Doe. The assaults were separated by periods of time in which reflection was possible."

2. <u>Applicable Law and Analysis</u>

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

As used in the statute, an " 'act or omission' " may include a discrete single physical act or a course of conduct encompassing several acts pursued with a single objective. (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) Section 654 prohibits courts from imposing separate sentences, or multiple punishment, for a single physical act that violates different provisions of law. (*People v. Jones* (2012) 54 Cal.4th 350, 358.) The statute also " 'prohibits punishment for two crimes arising from a single indivisible course of conduct. [Citation.] If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several independent criminal objectives,

36

he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct.  [Citation.]  The defendant's intent and objective are factual questions for the trial court, and we will uphold its ruling on these matters if it is supported by substantial evidence.' "  (*People v. Bui* (2011) 192 Cal.App.4th 1002, 1015.)

As the People point out, section 654 does not apply in cases where multiple criminal acts, though arguably incidental to a single intent and objective, are "separated by periods of time during which reflection was possible" and the record shows that, in committing each act, the defendant intended to inflict more harm, do more violence, or obtain additional gratification.  (*People v. Trotter*, *supra*, 7 Cal.App.4th at pp. 367-368 (*Trotter*) [multiple punishments properly imposed on multiple assaults based on multiple shots fired at one victim, because each shot posed separate and distinct risks to victim, even though all three shots were arguably incidental to single intent of scaring victim]; *People v. Harrison* (1989) 48 Cal.3d 321, 337-338 (*Harrison*) [multiple punishments properly imposed on multiple sexual assaults (digital penetrations) of victim because each act was intended to give the defendant additional sexual gratification]; *People v. Surdi* (1995) 35 Cal.App.4th 685, 687-688 [multiple punishments properly imposed on multiple stabbings of victim because each stabbing evinced a separate intent to do more violence to victim].)

The facts of *Trotter* and *Harrison* are particularly instructive.  In *Trotter*, the defendant was separately punished on two of three counts of assaulting a police officer with a firearm.  (*Trotter*, *supra*, 7 Cal.App.4th at pp. 365-366.)  The defendant, while

driving a stolen taxi cab, evaded the officer in a police pursuit on a freeway and, during the pursuit, fired three gunshots at the officer's vehicle. (*Id*. at p. 366.) On appeal, the defendant claimed that his separate punishment on two of the three assaults violated section 654 because the assaults were " 'part and parcel' " of a single course of conduct and were incidental to his single objective of forcing the officer to end the pursuit. (*Id*. at pp. 366-367.) Relying on *Harrison*, *supra*, 48 Cal.3d 321, the *Trotter* court disagreed. (*Ibid*.)

*Harrison* involved a defendant's commission of multiple sexual assaults (three acts of digital penetration) on a single victim, on a single occasion, for which separate punishments were allowed based on the defendant's intent to obtain additional gratification each time he penetrated the victim. (*Harrison*, *supra*, 48 Cal.3d at pp. 335-338.) Given that the purpose of section 654 is to ensure that a defendant's punishment will be " 'commensurate with his culpability,' " *Harrison* reasoned that, when a defendant intends to commit "a number of separate base criminal acts upon his victim," section 654 does not prohibit separate punishment for each act. (*Harrison*, at pp. 335-338.) *Harrison* observed: "There is no legal or logical bar to separate punishment where, as here*, each of defendant's 'repenetrations' was clearly volitional, criminal and occasioned by separate acts of force*." (*Id*. at p. 338.)

*Trotter* saw "no reason to limit *Harrison's* reasoning to sex crimes," and noted that, in *Harrison*, it "could not be seriously maintained that each sexual penetration evinced a different *type* of intent and objective. Yet our Supreme Court held each could be punished separately because their objectives and underlying intents were separate and

38

distinct." (*Trotter*, *supra*, 7 Cal.App.4th at p. 367, italics added.) *Trotter* went on to observe that the defendant's conduct in the case before it "became more egregious with each successive shot. Each shot posed a separate and distinct risk to [the officer] and nearby freeway drivers. To find section 654 applicable to these facts would violate the very purpose for the statute's existence." (*Id*. at pp. 367-368.) In addition, each shot "required a separate trigger pull"; all three shots were "volitional and calculated"; and were "separated by periods of time during which reflection was possible." (*Id*. at p. 368.)

For similar reasons here, section 654 does not bar multiple punishment on any of Maciel's convictions against Jane and Mary in counts 1 through 7. Contrary to Maciel's arguments, which we address *post*, substantial evidence shows that Maciel attacked Mary twice and attacked Jane three times. Moreover, during each attack, Maciel inflicted multiple puncture wounds and other grievous injuries on Jane and Mary—enough injuries, or individual acts, to separately support each conviction and to warrant unstayed sentences on each conviction. As the court indicated in declining to stay any of Maciel's sentences, the evidence showed that each attack and stab clearly posed a separate and distinct risk to Jane and Mary, and Maciel had ample time, between and during each attack and stab, to reflect on the horrific nature of what he was doing and the multiple and grievous injuries he was inflicting on Jane and Mary. Thus, the evidence amply supports the court's determination that imposing separate and unstayed sentences on counts 1 through 7 was necessary to make Maciel's punishment commensurate with his culpability. (*Trotter*, *supra*, 7 Cal.App.4th at p. 367.)

39

### 3. Maciel's Section 654 Arguments Lack Merit

#### (a) *Maciel's arguments regarding counts 2, 5, and 7 (Mary)*

Maciel first argues that the lesser terms on two of his three convictions involving Mary—the one-year-four-month term imposed on count 5 (mayhem) and the two-year term imposed on count 7 (assault with a deadly weapon)—were required to be stayed. He argues that the jury, in acquitting him of the attempted premeditated murder of Mary and in finding him guilty of the lesser offense of the attempted voluntary manslaughter of Mary (count 2), necessarily credited his testimony that he only attacked Mary once—after Jane attacked him with a screwdriver, he took the screwdriver from Jane, and Mary tried to wrestle the screwdriver from him.

Thus, Maciel claims, his three convictions involving Mary were necessarily based on his "single assault" of Mary, and his lesser sentences on counts 5 and 7 were required to be stayed. He correctly points out that the trial court cannot "countermand the jury" by making contrary factual findings in applying section 654. (*People v. Bradley* (2003) 111 Cal.App.4th 765, 770; *People v. McCoy* (2012) 208 Cal.App.4th 1333, 1339 ["[W]here there is a basis for identifying the specific factual basis for a verdict, a trial court cannot find otherwise in applying section 654."].)

The premise of this argument is unsound. The jury did not necessarily reject Mary's testimony in finding Maciel guilty of the attempted voluntary manslaughter of Mary in count 2. In count 2, the jury was instructed on attempted voluntary manslaughter based on unreasonable self-defense but not based on a sudden quarrel or heat of passion. (CALCRIM No. 604.) Maciel argues that, because Mary's testimony did not provide a

40

basis for a finding that he attacked Mary in unreasonable self-defense, but his testimony did, the verdict in count 2 "was necessarily based on [his] testimony." This is not entirely so.

To be sure, in finding Maciel guilty of the attempted voluntary manslaughter of Mary, the jury reasonably could have credited Maciel's testimony that *he believed*, albeit unreasonably, that he needed to attack Mary in order to defend himself against imminent danger from Mary or Jane. (CALCRIM No. 604.) At the same time, however, the jury reasonably could have credited Mary's testimony that her version of the attacks—that Maciel attacked her twice and without provocation—was what actually happened.

There was uncontroverted evidence that Maciel had been using steroids for years at the time of the attacks. And Dr. Dupee testified that chronic steroid use, over a long period of time, can cause paranoia and aggressiveness, along with sudden and severe " 'roid rage,' " which can be triggered by minimal or no provocation. But in convicting Maciel of attempted voluntary manslaughter, rather than attempted murder or premeditated attempted murder, in count 2, the jury did not necessarily reject Mary's testimony, or any part of it.

Alternatively, Maciel claims that even if the jury, and hence the trial court, could have credited Mary's testimony that there were two attacks on Mary, then one of his three sentences on his three convictions involving Mary (the mayhem conviction in count 5 carried the least punishment) must still be stayed, given that he suffered three convictions involving Mary based on two attacks on Mary. Again, we disagree.

41

The number of attacks on Mary is not the necessary touchstone for determining whether separate punishment could properly be imposed on counts 5 and 7, in addition to count 2, under section 654. As we have indicated, even though there were two separate attacks on Mary, not three, Maciel's convictions in counts 2, 5, and 7 are supported by separate and distinct acts of violence against Mary, inflicted during the two attacks.

During the second attack, Maciel beat Mary on both sides of her head, shoulders, face and neck, ostensibly inflicting Mary's depressed skull fracture and the multiple fractures on Mary's face. These injuries supported Maciel's conviction for the attempted voluntary manslaughter of Mary in count 2. During one of the attacks, Maciel stabbed Mary with a screw or part of a screwdriver, which had to be surgically removed through a puncture wound in her ear. This injury supported the mayhem conviction in count 5.[10] Mary also had two puncture wounds on her arm and other stab wounds on her body. These injuries supported Maciel's conviction in count 7 for assaulting Mary with a deadly weapon, a screwdriver.

Regardless of the order in which these injuries were inflicted, or whether all of these injuries were inflicted in one of the two attacks, it cannot be seriously denied that each of these injuries posed a separate and distinct risk to Mary, warranting the imposition of separate punishment on counts 2, 5, and 7. Separate punishment on counts 2, 5, and 7 is in line with the imperative of section 654 that the defendant's

---

[10] Section 203 provides that mayhem occurs when a person, "maliciously . . . deprives a human being of a member of his body, or disables, disfigures, or renders it useless . . . ."

42

punishment be commensurate with his culpability. "The purpose behind section 654 is 'to insure that a defendant's punishment will be commensurate with his culpability.' " (*Trotter*, *supra*, 7 Cal.App.4th at p. 367, quoting *People v. Perez* (1979) 23 Cal.3d 545, 552.) And, here, as in *Trotter*, "[d]efendant's conduct became more egregious with each successive [stab]. Each [additional stab] posed a separate and distinct risk to [Mary] . . . . To find section 654 applicable to these facts would violate the very purpose for the statute's existence." (*Trotter*, at p. 368.) Maciel could have stopped attacking Mary after inflicting any one of the injuries supporting his convictions in counts 2, 5, and 7, but he did not do so. Rather, he escalated the risk to Mary by continuing his violent acts. "There is no legal or logical bar to separate punishment where, as here, *each of defendant's [additional stabbing and beating attacks] was clearly volitional*, *criminal and occasioned by separate acts of force*." (*Harrison*, *supra*, 48 Cal. 3d at p. 338.)

Maciel further argues that the prosecutor based *both* the mayhem charge (count 5) and the assault with a deadly weapon charge (count 7) on the "chunk of metal" he left in Mary's "cheek" after he punctured her jaw with a screwdriver. For this reason, he argues, his punishment on count 5, with enhancements (the one-year-four-month term) should have been stayed because it was based on the same act as count 7. (*People v. Pitts* (1990) 223 Cal.App.3d 1547, 1560 [Where mayhem and assault are based on one attack on one victim, sentence on one offense must be stayed.].) But the record does not support this argument.

To be sure, the prosecutor argued that the mayhem charge was supported by the permanent disfigurement Mary suffered as a result of the piece of metal that had to be

surgically removed from her cheek (or jaw). But, regarding count 7, the prosecutor more generally argued that Maciel's overall or undivided act of generally attacking Mary with one or more screwdrivers supported the assault charge because, "by its nature," the screwdriver attack on Mary would "directly and probably result in the application of force" on Mary. (CALCRIM No. 875.)

The jury reasonably could have based its verdict in count 7 on any of the multiple puncture wounds Maciel inflicted on Mary during the two attacks, other than the depressed skull and facial fracture and the puncture wound to Mary's jaw, which supported counts 2 and 5, respectively. Thus, the record does not support Maciel's claim that the jury necessarily based its verdicts on counts 2 and 7 on the same act. (Cf. *People v. Corpening*, *supra*, 2 Cal.5th at pp. 311-314 ["precisely the same" act of forcefully taking victim's van, with rare coins inside the van, completed actus reus or robbing the victim of the coins and carjacking the victim of the van, and could only be punished once under § 654].)

(b) *Maciel*'s *claims regarding counts 1*, *3*, *4 and 6* (*Jane*)

Maciel argues that his sentences on two of his four counts involving Jane (counts 1, 3, 4, & 6) must be stayed because the evidence, at most, showed there were only two attacks on Jane—one in the house and one in the backyard—and not three attacks on Jane—one in the house and two in the backyard. Thus, he argues, "[a]s there were, at most, two assaults, there could be, at most, two unstayed sentences."

Again, we observe that the number of attacks on Jane is not the touchstone of whether section 654 applies to counts 1, 3, 4, and 6. (*Trotter*, *supra*, 7 Cal.App.4th at

44

pp. 366-367.)  Even so, the evidence shows there were three attacks on Jane.  Maciel's argument that there were at most two attacks on Jane disregards Jane's and M.B.'s testimony, which collectively showed that Maciel attacked Jane three times—once in the house and twice in the backyard.  Jane testified that Maciel first attacked her in the house, near the back door, and in doing so dislodged two of her teeth.  Jane's further testimony, together with M.B.'s, showed there were two attacks on Jane in the backyard.  M.B. saw Maciel attacking Jane in the backyard *and* saw a piece of metal sticking out of Jane's face *before* he saw Maciel leave the backyard, return with two screwdrivers, and attack Jane again—for the third time.

Maciel alternatively argues, as he did regarding count 2, that his conviction in count 1 for the attempted voluntary manslaughter of Jane was necessarily based on his testimony that he attacked Jane only one time, in the backyard.  Thus, he argues, *three* of his four sentences on counts 1, 3, 4, and 6 (all except one of the life terms imposed on counts 3 & 4) were required to be stayed.  We reject this argument for the reasons we rejected the argument regarding the counts involving Mary, counts 2, 5, and 7.

In count 1, the jury was instructed on the attempted voluntary manslaughter of Jane based on both unreasonable self-defense and a sudden quarrel or heat of passion.  The jury reasonably could have based its verdict in count 1 on the unreasonable self-defense theory, crediting Maciel's testimony that *he believed*, albeit unreasonably, that he needed to defend himself against Jane (CALCRIM. No. 875), while at the same time crediting Jane's and M.B.'s testimony that Maciel attacked Jane three times.  As discussed, the evidence showed that Maciel had been using steroids for years, and that his

45

prolonged steroid use could have caused him to be paranoid, aggressive, and to fly into sudden and severe "roid rage," without provocation. But, in crediting this evidence, including Maciel's testimony about his prolonged steroid use, the jury did not necessarily reject Jane's and M.B.'s testimony, or any part of it.

Maciel next argues that his sentence on count 6 must be stayed in light of his sentence on count 1, because these convictions were based on the same act. He correctly points out that (1) the prosecutor did not elect to tie any of his conduct to counts 1 or 6, and (2) no unanimity instruction was given. (CALCRIM No. 3500.) But even though the prosecutor did not tie any of Maciel's particular conduct to counts 1 and 6, as we have indicated the record shows that Maciel's convictions in counts 1, 3, 4, and 6 could have been based on separate and distinct acts of violence, and separate physical injuries inflicted, on Jane.

We first observe that the prosecutor did tie counts 3 and 4 to particular conduct. She indicated that count 3 (torture) was based on defendant's act of dislodging two of Jane's teeth with a screwdriver when he attacked her inside the house, and, given the instructions, the jury reasonably could have based count 3 on this particular conduct. (CALCRIM No. 810 [torture requires infliction of great bodily injury, intended to cause cruel or extreme pain and suffering for the purpose of revenge or any other sadistic purpose].) The prosecutor also indicated that count 4 (aggravated mayhem), was based on Maciel's act of deliberately sticking a screwdriver into Jane's left eye socket, causing her to permanently lose hearing in her left ear. The jury reasonably could have based its

46

verdict in count 4 on this particular conduct. (CALCRIM No. 800 [aggravated mayhem requires intent to permanently disable or disfigure].)

Later during her argument, the prosecutor told the jury that it could base its verdict in count 6 on *any* of Jane's injuries, all of which were "very, very serious" and caused Jane to suffer a traumatic condition. (CALCRIM No. 840 [infliction of injury on cohabitant must result in traumatic condition, that is, a wound or other bodily injury, whether minor or serious, caused by the direct application of physical force].) The prosecutor said, "So when he is stabbing her numerous times in all of these places in her body, in her ear, in her eye, in her neck, it resulted in a traumatic condition." In light of the prosecutor's entire argument, the jury reasonably could have based count 6 on any of the great bodily injuries or "very, very serious" injuries that Jane suffered, other than her two dislodged teeth (count 3) and the screwdriver that pierced her left eye socket and entered her brain (count 4). For example, the jury could have based its verdict on count 6 on Maciel's act of puncturing Jane's face with a screwdriver.

The prosecutor discussed counts 1 and 2 together, before she discussed counts 3, 4, and 6. She argued, among other things, that Maciel's combined attacks on Jane and Mary showed that he intended to kill both women. (CALCRIM No. 600 [attempted murder].) But in light of the prosecutor's entire argument, her discussion of count 1 with count 2 did not preclude the jury from basing the "direct step" element of its attempted voluntary manslaughter verdict in count 1 on different injuries to Jane than it based its verdicts in counts 3, 4, and 6. (CALCRIM No. 603 [attempted voluntary manslaughter requires at least one direct but ineffective step toward killing a person].) For example, in

47

addition to the injuries, discussed *ante*, that met the elements of counts 3, 4, and 6, Jane's throat was also punctured, and she suffered multiple facial fractures. Maciel's separate acts in inflicting the puncture wound to Jane's throat, and in inflicting her facial fractures, were sufficient to satisfy the direct step element of the attempted voluntary manslaughter conviction in count 1. In sum, because the separate criminal acts, each intended to inflict further injury and separated by sufficient amounts of time for reflection, support the convictions in counts 1, 3, 4, and 6, the trial court did not abuse its discretion in imposing separate punishment on these counts. (*Trotter*, *supra*, 7 Cal.App.4th at pp. 367-368.)

C. *Maciel's "Full" Three-year Base Term on Count 2 Is Unauthorized and Must Be Stricken, and the Matter Must Be Remanded for Resentencing*

As noted, the parties agree that the "full" consecutive three-year base term that the court imposed on Maciel's conviction in count 2 for the attempted voluntary manslaughter of Mary was unauthorized and must be stricken. (§§ 1170.1, 1170.16.) We agree that this term was unauthorized under section 1170.16. Thus, we strike the three-year base term on count 2. The matter must be remanded for resentencing.

1. Relevant Background

In count 1, Maciel was convicted of the attempted voluntary manslaughter of Jane. The court declared count 1 the principal count and imposed an eight-year term on count 1, comprised of the middle term of three years (1/2 the middle term of 6 years) because the crime was an attempted crime (§§ 664, subd. (a); 193, subd. (a) [voluntary manslaughter is punishable by 3, 6 or 11 years]), plus one year for the weapon enhancement, plus four years for the great bodily injury enhancement. On count 2,

48

defendant was convicted of the attempted voluntary manslaughter of Mary. The court imposed a consecutive term of four years four months on count 2, comprised of the "full" middle term of three years (1/2 of the middle term of 6 years), again because the crime was an attempted crime, plus four months for weapon enhancement (1/3 of the 1-year term) plus one year for the great bodily injury enhancement (1/3 of the 3-year term).

The court said that it was imposing the "full" three-year base term on count 2, pursuant to section 1170.16, "because these are two separate victims and this is a case involving manslaughter, albeit attempted manslaughter." But, as the parties and we agree, this was error. Section 1170.16 authorizes courts to impose a "full, separate, and consecutive term" on a second or other subsequent conviction for voluntary manslaughter, but the statute does not authorize courts to impose a "full, separate, and consecutive term" on a conviction for *attempted* voluntary manslaughter.

2. Applicable Law and Analysis

When, as here, a defendant is convicted of two or more felonies and a consecutive term of imprisonment is imposed under sections 669 and 1170, the defendant's aggregate term of imprisonment "shall be the sum of the principal term, the subordinate term, and any additional term imposed for applicable enhancements . . . ." (§ 1170.1, subd. (a).) The principal term is the "greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements. The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive

49

term of imprisonment is imposed, and shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses." (*Ibid*.)

Section 1170.16 sets forth an exception to section 1170.1, where a defendant has multiple convictions for voluntary manslaughter. Section 1170.16 provides: "In lieu of the term provided in section 1170.1, a full, separate, and consecutive term may be imposed for each violation of subdivision (a) of Section 192, whether or not the offenses were committed during a single transaction." Section 192, subdivision (a), distinguishes voluntary manslaughter from other types of manslaughter, but does not mention attempted voluntary manslaughter.[11]

When a consecutive, subordinate term is to be imposed on a second conviction for *voluntary manslaughter* (§ 192, subd. (a)), section 1170.16 authorizes the court to impose "a full, separate, and consecutive term" on the second voluntary manslaughter conviction, notwithstanding section 1170.1. The parties agree, however, that section 1170.16 did not authorize the court to impose a "full, separate and consecutive" three-year base term on count 2 because Maciel was not convicted of voluntary manslaughter in count 2. Rather, he was convicted of attempted voluntary manslaughter in count 2.

Whether section 1170.16 applies to attempted voluntary manslaughter, as well as to the completed crime of voluntary manslaughter, is a question of statutory construction.

---

[11] Section 192 states, "[m]anslaughter is the unlawful killing of a human being without malice," and manslaughter "is of three kinds." Subdivision (a) of section 192 lists, as one type of manslaughter, "voluntary" manslaughter "upon a sudden quarrel or heat of passion." Voluntary manslaughter is distinct from the other two kinds of manslaughter: involuntary manslaughter (§ 190, subd. (b)) and vehicular manslaughter (*id*., subd. (c)).

"In interpreting a statute, our primary goal is to determine and give effect to the underlying purpose of the law. [Citation.] 'Our first step is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning.' [Citation]. ' "If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." ' [Citation.] . . . [But] ' "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose . . . ." ' " (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.)

By its terms, section 1170.16 does not apply to attempted voluntary manslaughter. Additionally, the legislative history of section 1170.16 shows that the statute was only intended to apply to the completed crime of voluntary manslaughter, not to attempted voluntary manslaughter.[12] Indeed, the legislative history shows that the Legislature was concerned with authorizing courts to impose full, separate, and consecutive terms, rather than reduced, subordinate terms, on a defendant's second or other additional conviction for voluntary manslaughter, given that the completed crime of voluntary manslaughter involves an intentional killing. (Sen. Com. on Crim. Proc., Assem. Bill No. 1137 (1995-

---

[12] Section 1170.16 was enacted in 1996 as part of Assembly Bill No. 1137 (1995-1996 Reg. Sess.) (Stats. 1996, ch. 421, §1; Assembly Bill 1137). We grant Maciel's request, filed on July 30, 2020, to take judicial notice of two legislative documents concerning the legislative history of section 1170.16: (1) Senate Committee on Criminal Procedure, Assembly Bill No. 1137 (1995-1996 Reg. Sess.), June 4, 1996; and (2) Appropriations Committee Fiscal Summary, Assembly Bill No. 1137 (1995-1996 Reg. Sess.), August 12, 1996. (Evid Code, §§ 452, subd. (c), 459, subd. (a).) Nothing in these documents, or in any of the other legislative materials preceding the enactment of Assembly Bill No. 1137, indicates that the Legislature intended section 1170.16 to apply to attempted voluntary manslaughter.

1996 Reg. Sess.), June 4, 1996, p. 5 ["Where a defendant intentionally kills multiple persons, we demean the value of the second [or] third victim's life by not allowing for the imposition of [full] consecutive sentences."].) The Legislature's purpose in enacting section 1170.16 does not apply to multiple convictions for attempted voluntary manslaughter, and even if it did, the Legislature did not make the statute applicable to attempted voluntary manslaughter.

Thus, we conclude that the full consecutive three-year base term on count 2 was unauthorized under section 1170.16 and must be stricken, and we agree with the People that the matter must be remanded for resentencing. (*People v. Buycks*, *supra*, 5 Cal.5th at p. 893 ["We have held that when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' "].)

We observe that, if the court does not exercise its sentencing discretion anew on count 1, the principal count, or on any of the other counts, then the base term on count 2 will necessarily be one year, or one-third of one-half of the middle term of six years. (§§ 1170.1; 193, subd. (a), 664, subd. (a).) In this scenario, the determinate portion of Maciel's sentence will be reduced by precisely two years, from 18 years four months to 16 years four months (reflecting a 1-year-base term on count 2).

D. *Corrections to Abstract of Judgment and Sentencing Minute Order*

At sentencing, the trial court imposed but struck a $10,000 restitution fine (Pen. Code, § 1202.4, subd. (b)), $280 in criminal conviction fees (Gov. Code, § 70373) and

52

$210 in court operations assessments (Pen. Code, § 1465.8), on the ground that Maciel did not have the ability to pay. (*Dueñas*, *supra*, 30 Cal.App.5th 1157.)

The parties agree that Maciel's abstract of judgment on the indeterminate portion of Maciel's sentence has a clerical error in that it shows: (1) the court imposed but did not strike the $10,000 restitution fine, and (2) the court "stayed" imposition of both the criminal conviction fees and the court operations assessments. As the People also point out, the minute order from the July 26, 2019 sentencing hearing erroneously shows that the court "stayed" rather than struck its imposition of the $10,000 restitution fine, the $210 criminal conviction fee, and the $280 in court operations assessments.

Courts have inherent authority to correct clerical errors in court records in order to make the records correctly reflect the judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) We direct the superior court to fix the clerical errors in the July 26, 2019 sentencing minute order and the indeterminate abstract of judgment, as set forth in the disposition.

## IV. DISPOSITION

The three-year subordinate base term imposed on Maciel's attempted voluntary manslaughter conviction in count 2 is stricken as unauthorized under section 1170.16, and the matter is remanded for resentencing. On remand, the court is further directed to prepare a supplemental sentencing minute order and a corrected abstract of judgment (indeterminate), showing that the court previously struck rather than stayed its imposition of the $10,000 restitution fine, the $280 in criminal conviction fees, and the $210 in court operations assessments. Following resentencing, the court is further directed to forward certified copies of Maciel's new abstracts of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:


MILLER _____
Acting P. J.


SLOUGH _____
J.